FILED'07 SEP 10 08:42USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                        06-CR-324-BR

                    Plaintiff,                   OPINION AND ORDER

         v.

ALAN W. MONTGOMERY,

                    Defendant.


**KARIN J. IMMERGUT**
United States Attorney
**STEPHEN PEIFER**
Assistant United States Attorney
1000 S.W. Third, Suite 600
Portland, OR  97204
(503) 727-1000

              Attorneys for Plaintiff

**NOEL GREFENSON**
1415 Liberty Street S.E.
Salem, OR  97302
(503) 371-1700

              Attorney for Defendant


1  -   OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Alan W. Montgomery's Motion to Suppress Fruits of February 5, 2005, Search of Defendant's Residence (#12), Motion to Suppress Defendant's Statements of February 15, 2005 (#19), Motion for *Franks* Hearing (#50), and Motion for a Bill of Particulars (#20).

On August 9, 2006, the government brought a three-count Indictment against Defendant in which the government charged Defendant with Making False Statements to law-enforcement officials in violation of 18 U.S.C. § 1001(a)(2)(Count 1), Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(b) and (b)(2)(Count 2), and being an Accessory After the Fact in violation of 18 U.S.C. § 3 (Count 3).

On June 28, 2007, the Court conducted an evidentiary hearing on Defendant's Motions.  The Court heard testimony from Immigration and Customs Enforcement (ICE) Agents Daniel Lawrence Baldridge, James Donald Cole, Josh Scott Findley, and James Leo Mooney; former ICE Agent Glenn Watson; defense witness Eric K. Hatch; and Defendant.  After the hearing, the parties submitted supplemental memoranda.  The Court heard oral argument on July 27, 2007, and took the matter under advisement.

For the reasons that follow, the Court **DENIES** Defendant's Motions.

2  -  OPINION AND ORDER

## FACTS

Having weighed and evaluated all of the evidence presented at the evidentiary hearing, the Court finds the following facts by a preponderance of the evidence:

Based on an anonymous source, ICE agents began investigating Lester C. Weber III in November 2004.  On November 29, 2004, Agent Baldridge interviewed the source, who was Weber's former girlfriend, Robin Dorsey.  According to Dorsey, Weber had traveled to Kenya and married a Kenyan woman who had two young daughters.  Dorsey said Weber had shown her digital images of himself engaging in sexual abuse of one of the daughters and another child described as a "servant girl."  Dorsey also reported Weber was planning another trip to Kenya in the near future.

Agent Baldridge ran a records check on Weber and discovered he had a prior conviction in Oregon in the 1980s for sexual abuse of a minor.  Agent Baldridge also confirmed Weber had an airline reservation to fly to Kenya within days.  Agents learned Weber's residence was located at 8303 S.W. Locust Street, Tigard, Oregon; the residence was a house divided into two separate living quarters; and Defendant lived in one part of this "duplex" and a man named William McGregor lived in a detached garage type of building on the same property.

ICE agents obtained a search warrant for Weber's residence

to look for evidence of child pornography or other child-abuse crimes.  On December 3, 2004, agents went to Weber's residence to execute the warrant.  In an interview at the residence, Weber admitted he had sexual contact with his stepdaughter and had filmed and photographed that sexual activity in Kenya.  Weber asserted, however, that he left all of the images of child pornography in Kenya because he knew he could be detained if he attempted to return to the United States with such contraband.

Because agents found Weber's living area to be extremely cluttered and full of electronic equipment and accessories, including 40-50 computers, it was very difficult for agents to determine at the scene whether evidence of Weber's crimes was present in the residence.  Based in part on Weber's disclosures, agents ultimately seized 18 computers, nine personal digital assistants, several hundred DVDs and CDs, and other electronic equipment pursuant to the search warrant.  One of the seized computers contained emails among Weber, his wife, and his stepdaughter in Kenya that explicitly described sexual activity between Weber and the girl.  Although agents did not find any images of Weber's child pornography on the day they searched, they could not be certain that they found all of the evidence the search warrant authorized them to seize at Weber's residence because of the "overwhelming number" of computers and digital media where such matter could be stored.

4  -   OPINION AND ORDER

Agents also contacted Defendant during the search of Weber's residence.  Before agents took Weber to jail, Weber was allowed to give $3,100 in United States currency that he had intended to take with him to Kenya to Defendant to pay Weber's bills and to attend to his affairs while he was in custody.  Although Defendant was initially alarmed at the presence of armed federal agents, Defendant ultimately spoke with Agent Findley voluntarily, indicated he had been friends with Weber for approximately 17 years, and stated he recently began to rent a portion of Weber's house.  Defendant said he did not know anything about Weber's involvement in child sexual abuse or child pornography and even expressed to Agent Findley a desire to help with the investigation of Weber.  Agent Findley asked Defendant to contact agents if he found any child pornography or other possible evidence while looking after Weber's affairs.

The next day, December 4, 2004, Defendant called Agent Cole and reported he found some email references on computers in Weber's residence that might have some evidentiary value.  Based on Defendant's description of the emails, Agent Cole concluded these were the same emails that agents had seen during the search and, therefore, advised Defendant that they were not needed. Nonetheless, Agent Cole asked Defendant to call back if he found anything else that might be of value to the investigation.  The Court does not find credible Defendant's specific testimony that

Agent Cole told Defendant the government had "all the evidence it needed" from Weber's residence or that Defendant was free to destroy anything.

While Weber was in custody at the Multnomah County Detention Center and later at the Federal Detention Center (FDC) at Sheridan, he spoke with Defendant in several recorded telephone conversations. In a recorded conversation on December 5, 2004, that agents heard on January 31, 2005, Weber and Defendant discussed how Defendant would manage Weber's assets and other affairs while Weber was in jail. In this conversation, Defendant warned Weber not to confess to anything over the telephone and told Weber that he would "do what you ask me to do within the confines of the law."

In January 2005, a woman who identified herself as "Nancy" called ICE and spoke with Agent Findley. Nancy reported Defendant had bragged to her father that he had found child pornography in Weber's residence and then destroyed it. Agent Findley asked Nancy to ask her father whether he would be willing to give a first-hand account of this incident. Agent Findley's report dated March 2, 2005, indicates Nancy eventually called back and said her father was not a direct witness to Defendant's statements, a third party purportedly told her father that Defendant bragged about finding child pornography in Weber's residence, and her father did not want to be involved with the

6  -   OPINION AND ORDER

investigation of Weber.  The timing of Nancy's second call was
not documented by Agent Findley or any other agent, and none of
the agents could confirm whether her second call was received
before or after Agent Baldridge applied for a search warrant for
Defendant's residence on February 14, 2005.

Also in January 2005, Tamara St. John called ICE about
Defendant and spoke with Agent Findley.  St. John told Agent
Findley that she was visiting Weber's father when Defendant
arrived dressed in a suit and carrying a handgun on his hip.
Defendant bragged in St. John's presence about finding child
pornography in Weber's residence.  In particular, St. John heard
Defendant say that he had found two "kiddie porn" videos from the
1970s in Weber's residence and that they "made a good bonfire."

In the meantime, ICE obtained a warrant to search Weber's
Yahoo email account.  The account contained emails with explicit
sexual content between Weber and his wife Mary in Africa and
between Weber and his stepdaughter.  It also contained emails
between Defendant and Mary in which Defendant explained to her
that Weber had been arrested and that Defendant would send her
money.  After the search of Weber's Yahoo email account, Agents
Cole and Watson traveled to Kenya.  When they arrived at Mary's
house on January 13, 2005, all of the computers were missing.
Weber's stepdaughter, who confirmed Weber had photographed and
videotaped acts of sexual abuse, stated the computers had

disappeared approximately two weeks before the agents arrived. Mary refused to answer questions.

In another recorded telephone conversation that occurred in February 2005 between Defendant and Weber while Weber was at FDC Sheridan, Weber stated his father told him that Defendant had used Weber's money to buy himself a computer and a gun. Defendant promised to pay Weber back for the gun and stated he would "do pretty much anything [Weber] ask[ed], provided it . . . doesn't stretch." Defendant, however, also added, "The thing with the DVDs went a little bit there." Weber replied, "I understand, so no more discussion is necessary." Defendant told Weber that he had "cleaned up [the] house as best as [he] could."

On February 14, 2005, Agent Baldridge applied for a warrant to search Defendant's residence for evidence of child pornography. Although ICE agents did not believe Defendant possessed child pornography for his personal use, they believed Defendant was in possession of child pornography that he obtained from Weber's residence. Thus, a copy of the warrant to search Weber's residence in December 2004 was included in the warrant application to search Defendant's residence. The main objective in searching Defendant's residence was to recover evidence of Weber's child pornography and child sex abuse.

On February 15, 2005, at around 7:00 a.m., ICE agents arrived at Defendant's residence with the search warrant. Based on their

8 -   OPINION AND ORDER

experience in searching Weber's residence, the agents feared it
might also be difficult to find what they were looking for in
Defendant's place without his assistance, so they hoped to enlist
his cooperation in locating evidence of Weber's child pornography
crimes before attempting to search pursuant to the warrant.
Agents Baldridge and Findley noted Defendant's vehicle was not in
the driveway.  When they went to the front door, only Defendant's
wife, Su Ling Montgomery, answered the door.  After one of the
agents said they needed to speak to Defendant (without disclosing
they had a search warrant), Ms. Montgomery explained Defendant
left earlier that morning with an out-of-town visitor to
photograph waterfalls in Central Oregon, and he wasn't expected
back for "a while."  Ms. Montgomery gave the agents Defendant's
cell-phone number.  Agent Findley called that number and left a
voicemail message in which he stated ICE agents were at
Defendant's residence waiting to execute a search warrant and that
Defendant should contact them immediately.  The agents decided to
wait outside and asked Ms. Montgomery to let them know if
Defendant called her.

While they were waiting for Defendant to respond to the
voicemail message, Agents Baldridge, Cole, and Findley interviewed
William McGregor, the man who lived in the garage-type outbuilding
on the property.  They met McGregor at a local Burger King at
approximately 9:00 a.m.  McGregor told the agents that he used to

work for Weber's father, and, at one time, his sister was married
to Weber.

McGregor said he had a conversation with Defendant during
which Defendant offered to show McGregor a DVD that Defendant
found in Weber's residence containing images of Weber engaging in
sexual acts with his stepdaughter.  According to McGregor,
Defendant also said he had shown this DVD to his wife, Su Ling.
McGregor told agents that he believed Defendant planned to use the
DVD as leverage against Weber because Defendant told MCGregor the
DVD could "work for all of them", that Weber was smart to make his
child pornography in Africa, and that Defendant and McGregor could
make money by producing adult pornography.  McGregor also told the
agents that, in an effort to test Defendant, McGregor decided to
try to get a reaction from him by telling him that McGregor also
found something in Weber's residence containing evidence that
Weber engaged in sexual acts with his stepdaughter (specifically,
a memory card) even though that had not occurred.  Nonetheless,
McGregor believed Defendant later tried to find such a memory card
in Weber's residence.  McGregor also recounted a conversation with
Weber's parents in which they warned McGregor to say nothing about
what Montgomery found in Weber's residence.  Finally, McGregor
said Defendant told him Weber's attorney, Assistant Federal Public
Defender (AFPD) Christopher Schatz, advised Defendant to destroy
any evidence related to Weber's case.

10 -   OPINION AND ORDER

Agents Baldridge and Findley then interviewed Weber's father at his home in Tigard, Oregon, beginning at approximately 10:00 a.m. Weber's father expressed concern that Defendant was untrustworthy and was using Weber's assets for his own benefit. Although Weber's father also confirmed Defendant had offered to show him a DVD containing child pornography that he found in Weber's residence, Weber's father said he refused to view it and was ashamed of what his son had done. Weber's father also indicated it was possible Defendant told him that the video contained images of his son engaging in sexual acts with his stepdaughter in Africa and that Defendant had destroyed the evidence.

At this point, the agents decided to execute the warrant on Defendant's residence rather than continue to wait for Defendant to return. With new information that Defendant showed Su Ling Montgomery child pornography that likely came from Weber's residence, the agents hoped she might be able to assist them in locating it. At approximately 9:50 a.m., one of the agents read the warrant to Ms. Montgomery. She stated Defendant used their new Compaq Presario home computer (which Defendant purchased with Weber's funds) to show her the child pornography. Agents then began to search the house and to collect items to be seized in one place inside the house under Agent Mooney's supervision as evidence custodian.

11 -   OPINION AND ORDER

Approximately three hours later (between approximately 1:00 and 1:20 p.m.) as Defendant and his friend, Eric Hatch, came back into cell-phone range, Defendant received Agent Findley's voicemail message and called his wife's phone.  Agent Findley spoke with Defendant, and Defendant advised he was on his way home from the Mt. Hood area.  Agent Findley told Defendant that agents were in the process of searching his residence pursuant to a warrant for evidence of Weber molesting children, the agents wanted to speak with Defendant, and Defendant should return home as soon as possible.

Defendant said he didn't want to talk with agents without a lawyer present because Weber's attorney, AFPD Schatz, told him not to do so.  Nonetheless, Defendant then asked Agent Findley for details about why agents were there and what they were looking for in Defendant's residence.  Agent Findley encouraged Defendant to return home.  He told Defendant he would discuss in person the reason agents were at Defendant's residence.  Defendant, however, repeated he wanted a lawyer present before talking with agents. The conversation then ended, and Agent Findley "coordinated with the United States Attorney's Office" in an effort to secure a subpoena for Defendant to testify that afternoon before the Grand Jury about Weber molesting children overseas.

In a later cell-phone conversation apparently initiated by Agent Findley while Defendant was still on his way back to

12 -   OPINION AND ORDER

Portland, Agent Findley told Defendant to go to the federal
courthouse for a 2:00 p.m. appearance before the Grand Jury.
There is not any evidence that Defendant voiced any objection or
expressed any concern to Agent Findley about testifying before the
Grand Jury as to what he knew about Weber.  Indeed, Defendant
testified at the hearing on these Motions that he was willing to
do so.  There also is not any evidence that there was, in fact, a
subpoena issued for Defendant's appearance at the time Agent
Findley directed him to go to the courthouse.

In any event, in this same conversation and not in response
to any question by Agent Findley, Defendant said, "I found the
stuff that you were looking for, and I've already destroyed it.
It's gone."  Agent Findley encouraged Defendant to provide that
information to the Grand Jury.  Defendant then asked Agent Findley
whether "he had gotten himself in trouble because of that" and
whether the statement he just made to Agent Findley would get him
into trouble.  Agent Findley responded any statement made by
Defendant could definitely be used against him.  At this point,
and again not in response to any question by Agent Findley,
Defendant then offered the explanation that he destroyed evidence
of Weber's crimes after speaking with AFPD Schatz who, according
to Defendant, told him the government had enough evidence against
Weber and Defendant didn t have any obligation to turn the
evidence over.  Although the Court does not believe AFPD Schatz

13 -   OPINION AND ORDER

counseled Defendant to destroy evidence, the Court concludes
Defendant made this allegation to Agent Findley in an effort to
deflect potential culpability after he admitted destroying
evidence.

Finally, in this same cell-phone conversation, Defendant
expressed concern to Agent Findley about what to do with his
firearm (for which he had a "carry permit") if he was to enter the
courthouse.  Agent Findley assured Defendant that someone would
meet him at the courthouse, escort him, and safeguard his weapon
while he was inside.  When Defendant arrived at the courthouse,
however, there was not anyone outside to meet him.  Agent Findley
and Defendant then spoke again via cell phone, and, ultimately,
Agent Findley told Defendant that his appearance had been
"delayed" until the next day.

Although it is not clear whether Agent Findley asked
Defendant to come to his residence or whether Defendant said he
would be going there anyway, Defendant then drove to his residence
to find federal agents out front.  There are several
inconsistencies between the testimony of Defendant and other
witnesses as to the number of agents who met Defendant and the
manner in which those agents contacted Defendant in his driveway.
Based on the photographic and testimonial evidence offered by
Defendant's passenger, Eric Hatch, as well as the testimony of
several agents on the scene, the Court concludes this part of

Defendant's testimony is exaggerated and, therefore, unreliable.

Instead the Court finds the following: Defendant arrived at his residence at approximately 2:00 p.m. As Defendant's Jeep came to a stop in his driveway, Agents Cole and Watson met Defendant while other agents stood at a distance or remained in the house. The agents were wearing jackets with the words "Police," "U.S. Customs," or "U.S. Immigration and Customs Enforcement" on them. Because they knew Defendant was carrying a firearm, Agents Cole and Watson were both "wearing" long-guns and armed with their duty handguns. Although they had weapons accessible, none of the agents drew their firearms or pointed them at Defendant or his passenger.

Defendant's passenger, Hatch, is a photographer and had a camera ready and available. He took several digital photos that recorded the time of day of each image. Based on these time-stamped photos, the Court concludes it was approximately 2:10 p.m. when Agent Cole approached Defendant to remove him from the vehicle and to secure Defendant's firearm for officer safety. Agent Cole instructed Defendant not to move except as directed and to place his hands over his head while Agent Cole removed the firearm from Defendant's holster. As Defendant complied, Agent Cole assured Defendant that the weapon would be returned to him as soon as the search was completed. After Defendant's weapon was secured, Agents Cole and Watson put away their long-guns.

15 -   OPINION AND ORDER

Agent Cole then explained to Defendant that he was not under arrest, and Agent Findley read the search warrant to Defendant. The Court notes the agents did not place Defendant in handcuffs, make him sit in a police car, nor take his car keys from him. Instead Defendant was permitted to move about outside his residence while the agents continued to search pursuant to the warrant.

Shortly after Defendant's arrival, Agents Cole and Findley searched Defendant's Jeep even though they did not have a warrant to do so.  Agent Findley examined the laptop computer lying on the back seat of the Jeep, which belonged to Hatch, because Findley believed he had authority to do so under a "plain view" analysis.

Not long thereafter, Defendant said he needed to use the bathroom.  Agent Baldridge and possibly Agent Findley escorted Defendant to the bathroom inside the house.  Because agents were still conducting their search of the house, Defendant was not permitted to close the bathroom door while he was inside.  While Defendant was passing through the house either on his way to the bathroom or back outside, he saw his wife seated at the dining room table with an agent.

After Defendant went back outside, he began to ask questions about the government's investigation.  Agent Findley responded that he could not answer Defendant's questions because Defendant had indicated earlier that he did not want to speak to agents

without a lawyer present.  When Defendant said he could not afford
an attorney, Agent Findley replied Defendant was not entitled to a
court-appointed lawyer at that time because he was not under
arrest, had not been charged with a crime, and was not even a
target of their investigation.  Agent Findley added Defendant
would have to arrange for counsel if he wanted a lawyer present
before speaking with the agents.  Defendant then told Agent
Findley that he wanted to discuss the matter anyway.  Agent
Findley agreed and reminded Defendant that he could stop talking
at any time and that Defendant was "under no obligation" to speak
with agents.

    Agent Findley asked Defendant about evidence he reportedly
destroyed.  In response, Defendant acknowledged he found images
and movies of Weber engaging in sex acts with his wife and
stepdaughter, and then he destroyed all of this evidence.  When
asked why he destroyed the evidence, Defendant had several
explanations.  He said he thought the images were disgusting and
did not want to have them around.  Moreover, he believed agents
had all of the evidence they needed from Weber's residence based
on his telephone conversation with Agent Cole.  Finally, he said
AFPD Schatz told him that he was not under any obligation to
provide evidence to the authorities and, as long as Schatz did not
know about additional incriminating evidence, "it doesn't exist."
Defendant also said he was not trying to protect Weber, to gain

favor with Weber's family, or to brag to them about finding the evidence. Instead Defendant hoped Weber's family would not support Weber's wife and that Weber would pay for his crimes. Even though Agent Findley told Defendant that he did not believe any of these assertions, he also asked Defendant to describe the images he destroyed. Instead Defendant continued to say that he did not retain and, therefore, did not have any of the Weber evidence.

About this time, the other agents were wrapping up their work inside the residence and began to carry out boxes, a computer, CDs, DVDs, and other items they were seizing under the search warrant. Defendant became upset and told Agent Findley, "You know, you don't have to take all of that - I know you're not looking for my dirty laundry. You're just looking for evidence of Weber and what he did, and none of that's in there. You're not going to find it there." Agent Findley explained the agents didn't know what might contain digital evidence, so they would need to search all of what they were seizing. Still upset, Defendant repeated, "You're not going to find what you want there." Agent Findley then told Defendant, "If we knew where the evidence we were looking for was, that would be what - the only thing we would need to take."

Defendant seemed to consider Agent Findley's statement and then asked whether agents would still seize all of the things they

18 -   OPINION AND ORDER

had removed from the house if Defendant gave them exactly what they were looking for.  Agent Findley indicated he would "definitely reevaluate" how much needed to be seized if Defendant led them to the evidence they were seeking.

Defendant and Agent Findley went into the house, and Defendant  began looking around a computer desk inside the front door for a white plastic case containing a CD.  Because Defendant was not immediately able to find it there, Agent Findley left Defendant to ask some of the other agents whether they had seen it during the search.  By the time Agent Findley returned, Defendant was holding a DVD in a white paper sleeve marked with the handwritten words "Smoking Gun."  None of the agents, however, saw Defendant locate this DVD.

When Defendant handed the DVD to Agent Findley, Defendant stated everything the agents needed to convict Weber was on the DVD.  Defendant said he made the DVD by copying evidence of child pornography Defendant found on other DVDs and electronic media in Weber's residence and that he had placed all of this evidence onto the DVD.  Defendant, however, maintained he collected this evidence in order to cooperate with law enforcement.  After Defendant produced the "Smoking Gun" DVD, Agent Watson used a government computer to view it and confirmed the DVD contained evidence of Weber sexually abusing children.

Agent Watson asked Defendant to identify the hardware he used to create the DVD.  Defendant indicated he used the Compaq Presario computer to copy data from a yellow-colored USB thumb drive and from a battery-powered external USB hard drive, all of which agents had already identified for seizure.  Defendant told Agent Watson that he used the Compaq Presario computer for "all issues related to Mr. Weber" and that he purposely erased the contents of the yellow-colored USB thumb drive and the battery-powered external USB hard drive.  Nevertheless, Agent Watson was able to recover additional images from the yellow-colored USB thumb drive that were not contained on the "Smoking Gun" DVD.

Agent Mooney asked Defendant how many times he viewed the child pornography.  Defendant became "irritated" and did not respond immediately.  Then Agent Mooney resumed his duties as evidence custodian inventorying the evidence at a police car.  Defendant approached Agent Mooney and asked why he was removing so much evidence.  Agent Mooney responded he intended to continue to look for evidence of Weber molesting children.  Defendant repeated all of the evidence of child pornography from Weber's residence was on the "Smoking Gun" DVD.  After Agent Watson determined the evidence was, in fact, on the "Smoking Gun" DVD, the Compaq Presario Computer, the yellow-colored USB thumb drive, and the battery-powered external USB hard drive, the agents returned to

Defendant a number of other items they originally intended to take
away.

The agents left Defendant's residence at approximately
4:00 p.m.  Before leaving, they returned Defendant's firearm and
handed him a subpoena to testify before the Grand Jury the
following day.


**DISCUSSION**

Defendant seeks to suppress his statements made and the
evidence obtained from his residence on February 15, 2005.

Defendant first contends Agent Baldridge deliberately or with
reckless disregard for the truth omitted "Nancy's" later
statements from the warrant affidavit.  If those later statements
had been included, Defendant asserts the search warrant would have
been devoid of probable cause, and, as a result, his statements
and the evidence seized would be inadmissible at trial.
Defendant, therefore, requests a *Franks* hearing to establish the
application for the search warrant was defective.

Defendant also asserts his statements should be suppressed
because they were obtained after he invoked the right to counsel,
he was not advised of his *Miranda* rights, and the agents wrongly
told him that he was not entitled to appointed counsel even though
he was "in custody" at the time he made the statements at issue
and turned over evidence to ICE agents.

21 -   OPINION AND ORDER

Finally, Defendant moves the Court for an order requiring the government to provide a bill of particulars as to Count 3 of the Indictment in which Defendant is charged with being an Accessory After the Fact for receiving, relieving, comforting, and assisting Weber for the purpose of hindering or preventing Weber's prosecution.  Defendant asserts he is unable to defend himself adequately because the government does not specify the means by which it alleges Defendant assisted Weber.

I.   **Agent Baldridge did not deliberately or with reckless disregard for the truth omit material information from the warrant affidavit.**

    A.   **Standards**

Before a court reviews the sufficiency of a warrant, the defendant must make a substantial preliminary showing supported by an offer of proof that the affiant deliberately or with reckless disregard for the truth omitted material information from the warrant affidavit.  *Franks v. Delaware*, 438 U.S. 154, 164-65, 171 (1978)(addresses false statements in a warrant affidavit).  *See also United States v. Pace,* 898 F.2d 1218, 1232 (7th Cir. 1990) (employs analysis similar to that in *Franks v. Delaware* when Defendant alleges affiant omitted material information from the warrant affidavit).  Allegations of negligence or innocent mistake will not suffice.  *Franks*, 438 U.S. at 171.   If the defendant satisfies this requirement, the court will hold a *Franks* hearing to allow the defendant to inquire into the reasons for the

omission.  If the defendant establishes by a preponderance of the
evidence that the warrant affidavit contains perjured statements
or reflects a reckless disregard for the truth, the court must
then include the omitted material in the warrant application and
determine whether its inclusion vanquishes probable cause.  *Id.* at
156.  If the court determines probable cause is lacking, "the
search warrant must be voided and the fruits of the search
excluded to the same extent as if probable cause was lacking on
the face of the affidavit."  *Id.*

**B.    Analysis**

According to Defendant, Agent Baldridge's warrant application
is defective because it did not include the fact that "Nancy" made
a second call to ICE and informed Agent Findley that her father
was not a direct witness to Defendant's statement that he found
and destroyed child pornography in Weber's residence.  On this
record, however, the Court cannot determine whether Nancy's second
call occurred before Agent Baldridge submitted his warrant
application on February 14, 2005.  Although Agent Findley's
summary of his contact with Nancy is chronicled in a report dated
March 2, 2005, the report does not reflect nor does Agent Findley
remember the date this conversation took place.  Agent Findley
also has been unable to locate the notes he made during that
conversation even though such notes would ordinarily be found in
the case file.

In any event, even if one could infer Nancy made her second call before February 14, 2005, there is not any evidence that Agent Baldridge was aware of her second report.  Accordingly, the Court concludes Defendant has not established Agent Baldridge deliberately or with reckless disregard for the truth omitted material information from his Affidavit in support of the warrant application to search Defendant's residence.

Moreover, even if the Affidavit had included the information that Nancy's father was not a direct witness to Defendant's statements, the Court concludes a neutral magistrate would still have found from the sheer quantum of other evidence summarized in the Affidavit that there was a "fair probability" of finding evidence of Weber's child pornography in Defendant's residence. *See Illinois v. Gates*, 462 U.S. 213, 246 (1983)(probable cause to search means a "fair probability" that evidence will be found in a given place.").

Based on this record, therefore, the Court concludes Defendant has not met his burden under *Franks v. Delaware* to show that he is entitled to suppression of the evidence seized from his residence.

## II.  Under the totality of the circumstances, Defendant was not "in custody" for purposes of *Miranda* at the time he made his statements to agents on February 15, 2005.

### A.  Standards

Law-enforcement officers are "not required to administer

24 -   OPINION AND ORDER

*Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492 (1977). *Miranda* warnings are required "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. Cal.*, 511 U.S. 318, 322 (1994)(*per curiam*)(internal citations omitted).

The ultimate question when determining whether a person is "in custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Cal. v. Beheler*, 463 U.S. 1121, 1125 (1983)(quoting *Oregon v. Mathiason*, 429 U.S. at 495). Custody or seizure of a person requires more than a brief detention by law-enforcement officers. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The inquiry is an objective one: specifically, whether a reasonable person in Defendant's position would have believed he was not free to leave. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). When making that evaluation, the court considers the totality of the circumstances that confronted Defendant at the time of questioning in light of such factors as (1) the language used to summon Defendant, (2) the extent to which Defendant was confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain Defendant. *United States v. Crisco*, 725 F.2d 1228, 1231 (9th Cir.), *cert. denied*, 466 U.S. 977 (1984).

25 -   OPINION AND ORDER

**B.   Analysis**

In this case, the Court concludes Defendant was not, under the totality of the circumstances, "in custody" when he made the statements at issue; when agents seized evidence at his residence on February 15, 2005, pursuant to a search warrant; and when Defendant turned over evidence to agents.

> **1.   The language used to summon Defendant to his residence did not create a custodial environment.**

Defendant was "summoned" to his residence via a voicemail message and a series of cell-phone conversations with Agent Findley at a time when agents were not physically near him and Defendant was driving his own vehicle accompanied by a friend and armed with his own handgun.  Much of what Agent Findley communicated to Defendant was completely accurate and related to the lawful execution of the search warrant for Defendant's residence that was already underway by the time Defendant spoke with Agent Findley for the first time.  Although Agent Findley was unable to explain why his conversation with Defendant moved from Defendant's invocation of his right to counsel to the directive for Defendant to appear before the Grand Jury, the Court need not consider whether a reasonable person in these circumstances might view such a directive as punitive and as a response to Defendant's assertion of the right to counsel because Defendant did not view it that way in this case.  Instead Defendant testified he would have been "happy" to testify before the Grand Jury.  Thereafter

when Agent Findley told Defendant to return to his residence
because his Grand Jury appearance had been rescheduled, Defendant
did not give any indication that he was unwilling to do so.  In
fact, Defendant was very interested in what the agents were doing
at his residence and likely would have gone there anyway.

        Although Defendant was greeted at his residence by a
modest show of force, the situation de-escalated rapidly after
Defendant's firearm was secured.  Agents quickly informed
Defendant that he was not under arrest.  Moreover, agents did not
physically restrain or otherwise control him except to take
temporary custody of his firearm and to supervise him when he went
into the residence to use the bathroom.  When a reasonable person
is told he is not under arrest, he is likely to believe that he is
free to leave.  *Lucas v. United States,* 408 F.2d 835, 836 (9th Cir.
1969)(suspect was not "in custody" when he was told he was not
under arrest).  The Court notes, however, an otherwise custodial
situation cannot be negated by telling a suspect that he is not
under arrest.  *See United States v. Bravo*, 295 F.3d 1002, 1011 (9th
Cir. 2002).

        Nonetheless, under all of these circumstances, the Court
concludes the manner in which Defendant was summoned to his
residence on February 15, 2005, does not establish that Defendant
was "in custody" at the time Agent Findley interviewed him.


27 -   OPINION AND ORDER

**2.    The totality of the remaining circumstances did not create a custodial environment.**

The first exchange between Agent Findley and Defendant that suggested Defendant might have some culpability occurred in the telephone conversation when Defendant disclosed he had found evidence of child pornography in Weber's residence and destroyed it.  The Court notes Defendant volunteered that statement after he invoked his right to counsel, after Agent Findley directed him to go to the courthouse to appear before the Grand Jury, and not in response to any particular question by Agent Findley.

The next time Agent Findley "confronted" Defendant about his potential guilt occurred when Agent Findley questioned Defendant about his statement that he had destroyed evidence he found in Weber's residence.  Again, this exchange occurred after Agent Findley stated he would not discuss the investigation because Defendant wanted a lawyer present, Defendant responded that he couldn't afford a lawyer, Agent Findley told Defendant he didn't qualify for a court-appointed lawyer because he wasn't under arrest or in custody, and Defendant stated he wanted to talk with Agent Findley anyway.  Under these circumstances, the Court concludes the manner in which Defendant was confronted about his alleged destruction of evidence does not establish that Defendant was "in custody" at the time Agent Findley interviewed him.

The Court also finds the physical surroundings at the time Defendant was interviewed at his residence do not support any

28 -    OPINION AND ORDER

inference that Defendant was in custody.  Defendant's assertions
that he was "encircled" by multiple agents after his weapon was
removed and that the agents were "forceful" with him are belied by
his own photographic exhibits that show he stood in his front yard
with his hands in his pockets after the agents removed his weapon
and while the agents read the search warrant to him.  Agent
Findley interviewed Defendant outside of his residence, and, as
reflected in the photo marked as Defendant's Exhibit 106, the two
men stood at a conversational distance from one another.  Agent
Findley did not use physical force of any kind, did not handcuff
Defendant, did not place Defendant in a law-enforcement vehicle,
did not take Defendant's keys, and did not exhibit aggressive body
language.  Instead Defendant was free to move about his front yard
and seemed determined to engage Agent Findley in repeated efforts
to find out more about the investigation.

        The fact that several agents stood near Defendant at
various times also did not render Defendant "in custody."  Even
when an interview takes place in a police station behind closed
doors, it is not automatically custodial.  *Oregon v. Mathiason*,
429 U.S. 492 (1977)(a station-house interview was not custodial
under the totality of the circumstances).  *Cf*. *United States v.
Lee*, 699 F.2d 466, 468 (9th Cir. 1982)(defendant was "in custody"
during interview in FBI vehicle).  Indeed, it is routine protocol
during the execution of a residential search warrant for law-

29 -   OPINION AND ORDER

enforcement officers to detain the occupants of the residence for a limited time without implicating *Miranda*.    *Muehlar v. Mena*, 544 U.S. 93, 99 (2005)(officer safety justified handcuffing and detaining the occupants of a residence in the garage during execution of residential search warrant).    *See also Mich. v. Summers*, 452 U.S. 692, 702 (1981)(limited detention justified by the need to prevent flight, to protect officers, and to complete search in orderly manner); *United States v. Edwards*, 421 F.2d 1346 (9th Cir. 1970)(brief traffic stop is noncustodial).

In addition, even though ICE agents remained on the premises of Defendant's residence for approximately nine hours, Defendant was present for less than two of these hours and Agent Findley's questioning of Defendant only lasted approximately ten minutes.    Unlike the defendant in *Lee* who was questioned for over an hour in an FBI vehicle while other investigators were in and around his residence, the duration of questioning Defendant here does not support a finding of custodial interrogation.    699 F.2d at 468.

The Court notes the only show of force by agents occurred when Defendant first arrived at his residence and then was only for officer safety purposes while securing Defendant's weapon.    The record does not contain any reliable evidence that a weapon was ever pointed at Defendant.    While Defendant may have been momentarily concerned when he was told to put his hands on

his head and was patted down for his weapon, these actions were
consistent with officer-safety measures taken at the outset of any
residential search.  Thus, the Court concludes the agent's display
of force was not sufficient to render Defendant "in custody."

        Defendant also makes much of the fact that agents
escorted him to the bathroom and left the bathroom door partly
open while Defendant was inside.  He argues the fact that agents
supervised him while he was inside his residence constitutes a
custodial level of control over his movements.  Yet, as noted,
law-enforcement officers are legally justified in controlling the
movement of occupants of a residence during the execution of a
residential search warrant.  *Summers*, 452 U.S. at 702.

        Finally, Defendant contends his freedom was restricted
to a custodial degree when agents did not permit him to speak to
his wife while they executed the search warrant and talked with
Defendant.  Defendant's subjective state of mind, however, does
not have any bearing on whether a reasonable person would have
believed under the circumstances that he was free to leave.  *See*
*Berkemer*, 468 U.S. at 442.

        In short, Agent Findley's ten-minute interview of
Defendant was not custodial in nature.  Significantly, Defendant
rather than Agent Findley initiated this conversation and, in
effect, all of the other exchanges in which he made incriminating
statements.  Even though Defendant wanted Agent Findley to answer

31 -   OPINION AND ORDER

his questions, Agent Findley was reluctant to converse with
Defendant and reminded him about his earlier statement that he
wanted an attorney. Defendant argues he "reacted adversely" to
the removal of items from his residence, and, to add insult to
injury, Agent Findley coerced him into talking by incorrectly
advising him that he was not entitled to court-appointed counsel.
None of these circumstances, however, supports a conclusion that a
reasonable person would not feel free to decline being questioned
or to leave.

### III. All of Defendant's statements on February 15, 2005, were voluntary.

#### A.    Standards

The procedural protections afforded by *Miranda* are designed
to safeguard an accused's privilege against self-incrimination.
The defendant must be told that he has the right to remain silent;
that any statement he makes may be used as evidence against him;
and that he has the right to the presence of an attorney, either
retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444
(1966). Statements made by a defendant during custodial
interrogation may only be admitted into evidence if the defendant
voluntarily, knowingly, and intelligently waives his *Miranda*
rights. *Id.* The government bears the burden of proving valid the
defendant's waiver of *Miranda* rights. *Tague v. Louisiana*, 444
U.S. 469 (1980).

After an accused has invoked his right to have counsel
present during custodial interrogation, a valid waiver of that
right cannot be established by only showing that he responded to
further police-initiated custodial interrogation. *Edwards v.
Arizona*, 451 U.S. 477, 484-85 (1981).  Instead the government must
show the accused himself initiated further "communication,
exchanges, or conversations with the police." *Id*.

A valid *Miranda* waiver depends on the "totality of the
circumstances, including the background, experience, and conduct
of the defendant." *United States v. Garibay*, 143 F.3d 536 (9th
Cir. 1998)(quoting *United States v. Bernard S*., 795 F.2d 749, 751
(9th Cir. 1986)).  The Constitution does not require a criminal
suspect to know and to understand every possible consequence of a
waiver of the Fifth Amendment privilege. *Moran v. Burbine*, 475
U.S. 412, 422 (1986).  *See also Oregon v. Elstad*, 470 U.S. 298,
316-17 (1985).  The government's burden is merely to demonstrate
by a preponderance of the evidence that the confession was
voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  The
"crucial element" for voluntariness analysis is whether there was
"police overreaching." *Id*. at 163, 163 n.1.  Any doubts regarding
the waiver of a constitutional right must be resolved in favor of
no waiver. *Michigan v. Jackson*, 475 U.S. 635 (1986).

**B.  Analysis**

Defendant asserts his statements should be suppressed because

33 -   OPINION AND ORDER

they were obtained in violation of *Edwards v. Arizona*, 451 U.S.
477 (1981).  According to Defendant, after invoking his right to
counsel while talking with Agent Findley on the telephone, he
subsequently agreed to speak to agents based on Agent Findley's
allegedly incorrect advice that he was not entitled to court-
appointed counsel.  This "false or misleading" advice rendered
Defendant's waiver of his right to counsel invalid according to
Defendant.  In particular, Defendant contends he was entitled to
court-appointed counsel at the moment Agent Findley told him
otherwise because:  (1) "he had been served with a subpoena to
testify before a grand jury," (2) he was a suspect in a criminal
case involving possession of child pornography, and (3) his home
was being searched by "armed agents with a search warrant."

    Defendant's argument suffers from a number of infirmities.
The government does not contend Defendant validly waived his
*Miranda* rights.  The government contends, and this Court has
found, that Defendant was not "in custody" for *Miranda* purposes,
and, therefore, Defendant's *Miranda* rights were never implicated.
The government also correctly points out that *Edwards*, which
requires immediate cessation of questioning upon the suspect's
unequivocal request for counsel, does not apply to noncustodial
situations.  Thus, there is not any merit to Defendant's argument
that his statements were obtained in violation of *Edwards*.

    Although the government does not dispute Defendant told Agent

Findley he wished to speak to an attorney before answering any
questions, the government does not bear the burden to show the
valid waiver of a right that was invoked but never implicated.
The government's burden to show a defendant knowingly and
voluntarily waived his right to an attorney is only triggered when
the government seeks to admit statements made by the defendant
during custodial interrogation.  Here Defendant was not subjected
to custodial interrogation, and, therefore, Defendant's right to
counsel was never implicated.  Accordingly, even if Agent Findley
incorrectly advised Defendant that he was not entitled to court-
appointed counsel, this Court concludes such advice was not
coercive and did not render Defendant's statements involuntary
under the totality of the circumstances.

In any event, this Court also concludes Agent Findley's
advice was an accurate statement of the law.  Contrary to
Defendant's contention, he had not been "served with a [grand-
jury] subpoena" at the time of Agent Findley's advice.  Defendant
was not served with a subpoena to testify before the grand jury
until agents were leaving his residence at the conclusion of the
search and after Defendant made incriminating statements.
Moreover, the Court is not aware of any authority to support the
precept advanced by Defendant that grand-jury witnesses are *ipso
facto* entitled to court-appointed counsel.  Defendant relies on
*Jett v. Castaneda*, 578 F.2d 842, 844 (9th Cir. 1978), for the

proposition that a court may properly appoint counsel for a grand-jury witness, but the *Jett* court did not hold all grand-jury witnesses are entitled to court-appointed counsel.  In fact, the court held, *inter alia*, that the district court did not err when it appointed counsel for a inmate subpoenaed to testify in a grand-jury investigation of a prison stabbing for which he was the primary suspect.  *Id.* at 845.  Thus, even if Defendant could validly petition for court-appointed counsel prior to testifying before a grand-jury pursuant to *Jett*, he was not necessarily guaranteed such appointment.

Finally, Defendant does not cite nor has the Court found any authority to support the proposition that a "suspect" in a criminal case is entitled to court-appointed counsel or that the right to court-appointed counsel is triggered by the presence of "armed agents with a search warrant."

In summary, the Court does not find any basis to conclude Defendant's statements to Agent Findley were involuntary notwithstanding his announcement during a telephone conversation with Agent Findley that he wished to speak to an attorney.

**IV.  There is not any basis to suppress the "Smoking Gun" DVD.**

Defendant's final argument in favor of suppression is that the "smoking gun" evidence must be suppressed because it is the fruit of an *Edwards v. Arizona* violation.  451 U.S. 477 (1981). In other words, Defendant argues "but for" Agent Findley's failure

to scrupulously honor Defendant's invocation of the right to
counsel, Defendant would not have produced the "smoking gun" DVD.

Having already concluded that there was not any *Edwards*
violation under these circumstances, the Court rejects this
argument.  Notably, the government contends even if an *Edwards*
violation had occurred, the "smoking gun" DVD would inevitably
have been discovered pursuant to their valid warrant search of
Defendant's residence.  *See, e.g., Nix v. Williams*, 467 U.S. 431,
446-47 (1984)(comprehensive search underway at the time police
obtained information in violation of the defendant's right to
counsel would inevitably have resulted in the discovery of a
body).

Accordingly, based on this record, the Court concludes
Defendant is not entitled to suppression of testimonial or
tangible evidence seized because he was not "in custody" at the
time he made the statements and produced the incriminating
evidence, and, in any event, he did so voluntarily.

## V.    Defendant's Motion for Bill of Particulars is moot.

### A. Standards

A motion for a bill of particulars is brought under Rule 7(f)
of the Federal Rules of Criminal Procedure.  The purposes of a
bill of particulars are threefold:

> [T]o inform the defendant of the nature of the charge
> against him with sufficient precision to enable him to
> prepare for trial, to avoid or minimize the danger of
> surprise at the time of trial, and to enable him to

37 -    OPINION AND ORDER

> plead his acquittal or conviction in bar of another
> prosecution for the same offense when the indictment
> itself is too vague, and indefinite for such purposes.

*United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991)

(internal citations omitted).  The bill of particulars is not

intended as a discovery device and is properly denied if the

indictment is sufficient to serve the above purposes.  *See, e.g.,*

*United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985).

**B.   Analysis**

Defendant moves the Court to require the government to

provide a Bill of Particulars as to Count 3 to enable Defendant to

defend himself adequately against this charge.  Specifically,

Defendant moves to have the government specify "the means by which

it alleges Defendant received, relieved, comforted and assisted

Lester Christian Weber in order to hinder or prevent his

apprehension, trial, and punishment."

Based on this record, the Court concludes the Indictment,

together with the extensive facts developed at the evidentiary

hearing on June 28, 2007, are sufficient to apprise Defendant of

the nature of Count 3 (Accessory After the Fact) and to enable him

to prepare adequately for trial and to evaluate alternatives.

Accordingly, Defendant's Motion is denied.

## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion to

Suppress Fruits of February 5, 2005, Search of Defendant's
Residence (#12), Motion to Suppress Defendant's Statements of
February 15, 2005 (#19), Motion for *Franks* Hearing (#50), and
Motion for a Bill of Particulars (#20).

IT IS SO ORDERED.

DATED this 7th day of September, 2007.

ANNA J. BROWN
United States District Judge

39 -   OPINION AND ORDER